UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RONALD ROSS,

        Plaintiff,

    v.

CITY OF OAKLAND, et al.,

        Defendants.

Case No.  14-cv-00800-MEJ

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 74

## INTRODUCTION

Plaintiff Ronald Ross brings this 42 U.S.C. § 1983 case against Defendants City of Oakland (the "City") and Sergeant Steven Lovell (collectively, "Defendants"), alleging that Lovell maliciously prosecuted him and failed to turn over exculpatory evidence leading to Ross's conviction for attempted murder.  The Alameda Superior Court subsequently granted Ross habeas relief and overturned his conviction.  Now pending before the Court is Defendants' Motion for Summary Judgment.  Dkt. No. 74.  Ross filed an Opposition (Dkt. No. 104), and Defendants filed a Reply (Dkt. No. 106).  The Court held a hearing on this matter on July 2, 2015.  Dkt. No. 112. Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **GRANTS** Defendants' Motion for the reasons set forth below.

## BACKGROUND

The following facts are undisputed unless otherwise indicated:

### A.     Factual Background

On the evening of April 15, 2006, Oakland Police Department ("OPD") officers responded to the shooting of Renardo Williams in Campbell Village, Oakland, California.  Consolidated

Undisputed Facts ("CUF")[1] #1, Dkt. No. 106-1.  On April 17, 2006, Sergeant Steven Lovell was assigned to investigate the shooting.  *Id.* #2.  Lovell reviewed the OPD Crime Report for the shooting and the information collected from the scene.  *Id.* #3.  His initial case review revealed that the only information that officers could get from Williams before he was taken to the hospital was that he was shot in front of his home.  *Id.* #4.

Lovell also learned that the only people who gave the officers substantive information about what took place following the shooting were Marie Abner and an Oakland Housing Authority officer.  *Id.* #6.  He learned that Marie Abner informed police that while she was inside 902 Campbell Village, she heard a knock on the door of 900 Campbell Village and then a gunshot.  *Id.* #7.  When she went outside, she saw that Williams had been shot.  *Id.*  Williams told her that he did not know who shot him.  *Id.*  Lovell also learned that the Oakland Housing Authority officer informed police that on April 14, 2006, the day before the shooting, a woman named Nikisha Stuart had reported that the man who lived at 900 Campbell Village had a dispute with her teenage son, Steven Embrey, Jr.  *Id.* #8.

Based on the information from the Oakland Housing Authority officer, Lovell ran Steven Embrey, Jr.'s name through the "LRMS" database, a police tool that matches names, addresses, and crime reports.  *Id.* #10.  The LRMS search revealed that Steven and Ross used to live at the same address, 2817 Filbert Street, Oakland, California, and that Ross's address at the time of the shooting was across the street from Campbell Village.  *Id.* #11.  Lovell put together a six-person photo line-up, which included Ross's photograph.  *Id.* #12.

On April 18, 2006, Lovell and Lieutenant Steven Nowak met with Williams at the hospital.  *Id.* #13.  While there, Lovell took a tape-recorded statement from Williams about the dispute on the day before the shooting, the shooting itself, and Williams's description of the shooter.  *Id.* #21.  Williams informed Lovell that he had a dispute with Stuart and Embrey in Campbell Village on the day before the shooting.  *Id.* #14.  According to Williams, he confronted Embrey because

---

[1] The CUF, prepared by Defendants, consolidates their Statement of Material Facts, Dkt. No. 73, with Plaintiff's responses and his Statement of Material Facts in Dispute, Dkt. No. 104-1.  For clarity, the Court refers to this document rather than the parties' individual statements and identifies disputed facts where necessary.

Embrey hit Williams's daughter; afterwards, Williams had an exchange with Embrey's mother, Stuart. *Id.* Williams informed Lovell that just before the shooting, he was at 900 Campbell Village Court and heard a knock at the door. *Id.* #15. Williams informed Lovell that when he answered, he saw Embrey and two men; one of the men asked Embrey, "is that him?" and when Embrey nodded, one of the men shot Williams in the chest. *Id.*

Before showing Williams the photo line-up, Lovell had Williams describe the man who shot him. *Id.* #16. Then, Lovell admonished Williams as follows:

> YOU WILL BE ASKED TO LOOK AT SEVERAL PHOTOGRAPHS. THE FACT THAT THE PHOTOGRAPHS ARE SHOWN TO YOU SHOULD NOT INFLUENCE YOUR JUDGMENT. THE PHOTOGRAPHS MAY OR MAY NOT INCLUDE THE PHOTOGRAPH OF THE PERSON WHO COMMITTED THE CRIME. YOU ARE NOT OBLIGATED TO IDENTIFY ANYONE. IT IS JUST AS IMPORTANT TO FREE INNOCENT PERSONS FROM SUSPICION AS TO IDENTIFY GUILTY PARTIES. PLEASE TAKE YOUR TIME AND LOOK AT EACH OF THE PHOTOGRAPHS BEFORE ATTEMPTING TO IDENTIFY ANYONE. KEEP IN MIND THAT HAIR STYLES ARE EASILY CHANGED, AS ARE BEARDS AND MUSTACHES. PHOTOGRAPHS DO NOT ALWAYS DEPICT THE TRUE COMPLEXION OF A SUBJECT; THEY CAN BE DARKER OR LIGHTER.
>
> PLEASE DO NOT DISCUSS THE CASE WITH OTHER WITNESSES NOR INDICATE IN ANY WAY WHETHER YOU HAVE IDENTIFIED SOMEONE.

*Id.* #17. Williams acknowledged that he understood the admonition that Lovell gave him. *Id.* #18.

The following facts are disputed. According to Defendants, at the hospital, Williams reviewed the photo line-up and identified Ross as the man who shot him. Lovell Decl. ¶ 18 & Ex. C; Nowak Decl. ¶ 7. Defendants provided the document that Williams signed with the admonition above as well as Williams's signature next to the photograph of Ross, thus identifying Ross as the shooter. *See* Lovell Decl., Ex. C, Dkt. No. 83. Ross, however, relying on a Declaration Williams wrote on October 13, 2011 around the time of Ross's habeas proceedings, asserts that Williams initially told Lovell that he did not recognize any of the suspects in the photos. Pl.'s Stmnt. of Material Facts at 1 (citing Williams Decl., Ex. A, Dkt. No. 104-4). Based on Williams's Declaration, Ross also states that Lovell "silently indicated and or instructed Williams to identify

[Ross] as the person who shot him." *Id.* at 2 (citing Williams Decl.). Ross further asserts that Williams informed Lovell that none of the suspects in the photo line-up was the person who shot him. *Id.* (citing Williams Decl.). Williams wrote in his Declaration that he only identified Ross as a favor to Lovell. *Id.* at 3 (citing Williams Decl.).

Following the meeting with Williams at the hospital, on April 19, 2006, Lovell met with Travis Abner and his mother at a location away from Campbell Village. CUF #22. Abner's mother had contacted the OPD stating that he had information about the shooting. *Id. #21.* At the meeting, Abner informed Lovell that the day before shooting, he saw Embrey injure Williams's daughter and then saw Williams and Embrey get into a dispute. *Id. #23.* Abner informed Lovell that just before the shooting, he and Williams were playing videogames when there was a knock at the door. *Id. #24.* Williams answered, and Abner went to see what was going on. *Id. ##24, 25.* Abner saw Embrey and another man at the door. *Id. #25.* Abner informed Lovell that Abner and the man who shot Williams looked at one another just before the man shot Williams. *Id. #26.* Before showing Abner an unmarked copy of the photo line-up that Lovell showed Williams, Lovell gave Abner the same admonishment he gave Williams. *Id. #27.* Abner acknowledged he understood the admonition and proceeded to identify Ross as the shooter. *Id. ##28, 29.* Lovell took a tape-recorded statement capturing the information that Abner provided regarding the incident that took place on the day before the shooting, Abner's opportunity to see the shooter, and Abner's identification of Ross. *Id. #30.*

Lovell attempted to locate Embrey, including going to his mother's home, running Embrey's name through another database, and instructing the Oakland Housing Authority to stop Embrey if he was seen. *Id. #34.* He also tried more than once to meet with Stuart and left his business card with Stuart at her home. *Id. #35.*

On April 26, 2006, police arrested Ross in the Campbell Village neighborhood. *Id. #37.* That same day, Lovell executed a search warrant on Ross's mother's home. *Id. #38.* The next day, on April 27, 2006, Lovell interviewed Ross at the police station. *Id. #39.* Ross informed Lovell that in around 1997, Ross's mother and Stuart lived in adjoining units on Filbert Street, and Ross stayed with his mother. *Id. #40.* Ross's mother and Stuart spoke daily, and Stuart's children

4

spent time with Ross's mother. *Id.* Ross told Lovell that he was at his mother's home across the street from Campbell Village when the shooting occurred. *Id.* #41. Ross also informed Lovell that he had seen Williams around Campbell Village before the shooting. *Id.* #42. Lovell also took a statement from Ross's mother. *Id.* #43.

On April 28, 2006, the District Attorney's Office filed an information charging Ross with attempted murder. *Id.* #44. Prosecutors independently reviewed the crime report, witness statements, and physical evidence, including reviewing the photo line-ups to ensure that they were not misleading or unduly suggestive. *Id.* ##45, 46. Prosecutors independently met with Williams before the preliminary hearing. *Id.* #47. They independently determined that there was sufficient cause to maintain the action against Ross. *Id.* #48. Lovell never pressured the prosecutors in any way to prosecute Ross. *Id.* #49.

In August 2006, there was a preliminary hearing. *Id.* #50. Williams was the only witness who was called to testify. *Id.* At the preliminary hearing, Williams identified Ross in court as the shooter. *Id.* #51. After screening for probable cause at the preliminary hearing, the court held that there was sufficient cause to hold Ross to answer for attempted murder charges. *Id.* #52. Prosecutors independently interviewed Embrey and Travis Abner before trial. *Id.* ##53, 54.

At trial, Williams repeatedly identified Ross in court at the shooter. *Id.* #55. He testified, "you can't forget somebody who looked you in the face and shot you." *Id.* #56. Abner and Embrey also identified Ross in court as the shooter. *Id.* ##57, 58. Meanwhile, Ross testified that he was "positive" that during the shooting he was at his mother's house watching the NBA playoffs. *Id.* #59. This alibi was a significant part of Ross's defense. *Id.* #60. Ross was impeached with the fact that the NBA playoffs had not started when the shooting happened; they began one week later. *Id.* #61.

Ross was convicted for attempted murder, but the Alameda County Superior Court subsequently vacated his conviction on February 20, 2013 based on the sole ground that Nikisha Stuart lied at Ross's Trial. *Id.* #62; *see* Pereda Decl., Ex. S, Dkt. No. 99 (Alameda Superior Court's Order Granting Petition for Writ of Habeas Corpus).

//

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.    Procedural Background**

Ross filed this lawsuit on February 21, 2014, alleging a malicious prosecution claim and a *Brady* violation claim against the City of Oakland and various Doe officers.   Dkt. No. 1.  His original complaint discusses Williams's Declaration and the same facts contained within that Declaration.  *See id.*  Ross has filed various iterations of his complaint while this suit has been pending, and on January 7, 2015, the Court granted the parties' stipulation providing Ross with leave to amend to add Lovell as a named Defendant.  Dkt. No. 66.  Ross filed the operative Fourth Amended Complaint on January 20, 2015.  Dkt. Nos. 67-68.

Defendants filed their Motion for Summary Judgment on May 13, 2015.  While Defendants raise a number of arguments, they primarily contend that Ross lacks evidence to support his claims against them.  Mot. at 11, 13.  They assert that the only evidence Ross has against Lovell is Williams's Declaration, and it is not competent evidence for consideration at summary judgment, because (1) at trial, the Declaration itself would be inadmissible, and (2) Ross has not shown that Williams will be available to testify to the contents of his Declaration at trial. *Id.* 13-15.  As such, they argue that Ross cannot support his malicious prosecution and *Brady* claims.  Ross's Opposition relies heavily on Williams's Declaration, arguing that the Declaration itself is admissible even if Williams is unable to testify.  Opp'n at 6-7[2].

Additionally, Ross's counsel requests more time to conduct discovery to oppose Defendants' Motion.  *See* Rule 56(f) Goff Decl., Dkt. No. 104-3.  Specifically, Ross now seeks more time to locate and depose Williams, as well as to conduct further discovery about Lovell and the City of Oakland's training procedures.  *Id.*  Defendants oppose Ross's request, attaching an email from Ross's counsel on April 22, 2015 stating that he "decided not to depose Lovell or file any interrogatories."   Pereda Suppl. Decl., Ex. V, Dkt. No. 106-3.  Defendants also argue that Ross has long known the importance of Williams's testimony to his case, and "[t]he time has long passed to procure [Williams]."  Reply at 7.

The Court ordered Ross to submit a declaration describing his efforts to locate Williams

---

[2] Plaintiff's Opposition did not provide page numbers, but ECF imprints each page with a page number, so the Court refers to the ECF page numbers in this Order.

and what leads remain to locating him.  Dkt. No. 108.  Ross responded with a declaration by his counsel, as well as his own declaration that essentially repeats his counsel's declaration.  Dkt. Nos. 109 (Goff Decl.); 110 (Ross Decl.).  Ross's attorney hired "numerous individuals at various times who reside in the area of Oakland where Williams was last known to have resided" to locate Williams (or to "at least keep an eye out for him"), but he states that these efforts have been unsuccessful.  Goff Decl. ¶ 4.  He also states that "an investigator was retained to locate the whereabouts of Mr. Williams on or around the time period that the Defendant requested for Williams to be produced for discovery purposes," but this too was unsuccessful.  *Id.* ¶ 6.  Ross's counsel also conducted searches on Google and Facebook, as well as searches on the California Department of Corrections and Rehabilitation website and Alameda County's inmate database, but could not locate Williams.  *Id.* ¶¶ 7-8.  He identified the following remaining leads: (1) recent information from people in Williams's last known neighborhood that they "heard of Williams recently being in Oakland," and that, based on this information, Ross's counsel intends to hire another private investigator; and (2) Ross's counsel was in the process of purchasing a "Lexis-Nexis Search" software program to locate Williams.  *Id.* ¶¶ 10-12.

### LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by

1   pointing out to the district court that there is an absence of evidence to support the nonmoving

2   party's case.  *Celotex*, 477 U.S. at 324-25.

3          If the moving party meets its initial burden, the opposing party must then set forth specific

4   facts showing that there is some genuine issue for trial in order to defeat the motion.  Fed. R. Civ.

5   P. 56(e); *Anderson*, 477 U.S. at 250.  All reasonable inferences must be drawn in the light most

6   favorable to the nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir.

7   2004).  However, it is not the task of the Court to scour the record in search of a genuine issue of

8   triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The Court "rel[ies] on the

9   nonmoving party to identify with reasonable particularity the evidence that precludes summary

10  judgment."  *Id.*; *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

11  Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine

12  issue of fact, where the evidence is not set forth in the opposing papers with adequate references

13  so that it could conveniently be found."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031

14  (9th Cir. 2001).  If the nonmoving party fails to make this showing, "the moving party is entitled

15  to a judgment as a matter of law."  *Celotex*, 477 U.S. at 323 (internal quotations omitted).

16                                     **PRELIMINARY MATTERS**

17  **A.      Rule 56(d) Request for Further Discovery**

18         Ross's counsel filed a declaration pursuant to Federal Rule of Civil Procedure 56(f), in

19  which he requests additional time to conduct further discovery to respond to Defendants' Motion

20  for Summary Judgment.  It appears that Ross intended to make such a request under Rule 56(d)

21  but mistakenly made the request under subsection (f), the former provision that allowed a party to

22  seek additional discovery.  *See* Fed. R. Civ. P. 56 advisory committee's note (subdivision (d) of

23  Rule 56 "carries forward without substantial change the provisions of former subdivision (f).").

24         "Rule 56(d) 'was designed to ensure that a nonmoving party will not be forced to defend a

25  summary judgment motion without having an opportunity to marshal supporting evidence.'"

26  *Freeman v. ABC Legal Servs. Inc.*, 827 F. Supp. 2d 1065, 1070 (N.D. Cal. 2011) (quoting *Rogers*

27  *v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 980 (C.D. Cal. 1999)); *see also Burlington*

28  *N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 773

United States District Court
Northern District of California

8

(9th Cir. 2003) (Rule 56(d) "provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence." (quotation omitted)).  It thus provides that the court may deny or continue a motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition[.]"  Fed. R. Civ. P. 56(d).

To seek relief under Rule 56(d), the requesting party must show (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery, (2) the facts sought exist and (3) the sought-after facts are essential to oppose summary judgment. *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008).  "The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001).  Failure to comply with these requirements "is a proper ground for denying discovery and proceeding to summary judgment." *Family Home*, 525 F.3d at 827 (quotations omitted).

Finally, this rule requires discovery only "where the non-moving party has not had the opportunity to discover information that is essential to its opposition." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (quoting *Anderson*, 477 U.S. at 250 n.5).  A moving party is not entitled to additional discovery under Rule 56(d) "if it fails diligently to pursue discovery before summary judgment." *Mackey v. Pioneer Nat'l Bank*, 867 F.2d 520, 524 (9th Cir. 1989) (citations omitted).  "[T]he district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past." *Conkle v. Jeong*, 73 F.3d 909, 914 (9th Cir. 1995) (internal quotation omitted).  Finally, the "mere hope that further evidence may develop prior to trial is an insufficient basis" for a continuance under Rule 56(d). *Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 344 (9th Cir. 1978).

In his request to conduct further discovery, Ross asserts the following:

> The Plaintiff needs to conduct further efforts to locate Renardo Williams for purposes of deposing Mr. Williams who testimony is significant in this case.

> The Plaintiff needs to conduct discovery of the Defendant (Lovell) police officer personnel because his credibility is significant in this case.
>
> The Plaintiff needs to conduct discovery of the City of Oakland regarding its training procedures because whether their training procedures are adequate or not will be significant to this case.

Rule 56(f) Goff Decl. ¶¶ 2-4.  Ross does not provide any further indication as to what specific facts he hopes to illicit from his proposed additional discovery.

Defendants reject the notion that additional discovery is warranted.  Reply at 6-7.  The Court agrees.  First, Ross has provided no indication about why he did not conduct the discovery he now proposes during the pendency of this case, and in particular, the last six months from when the Court set its Case Management Scheduling Order to when dispositive motions were due (*see* Dkt. No. 60).  Ross never requested an extension of time to conduct further discovery, nor did he file any motions to compel discovery.  Second, although Ross only named Lovell as a Defendant to this case in his Fourth Amended Complaint on January 20, 2015 (Dkt. Nos. 67-68), he knew about Williams's Declaration since at least the time when he filed this action, and Williams's Declaration explicitly names Lovell.  Ross does not explain why he waited to name Lovell or why he delayed in conducting discovery about Lovell during the months after Ross named him before the close of discovery.  Defendants further contend that they offered to make Lovell available for deposition even after the close of discovery but indicate that Ross declined.  *See* Reply at 7 (citing Pereda Suppl. Decl., Ex. V).

Third, Ross has known about the importance of Williams's testimony since the inception of this case.  Ross's initial Complaint specifically cites Williams's Declaration and relies heavily on the facts extracted from the Declaration, which shows that even early in this case Ross recognized the significance of Williams's testimony.  *See* Compl. ¶¶ 4-6, 12-13, 15, Dkt. No. 1. Ross does not explain why he has waited to procure discovery from Williams or about Williams until now.  And while Ross and his counsel indicate that some efforts were made to locate Williams, their Declarations are vague about who they specifically hired to locate Williams and how those people went about locating Williams.  Furthermore, the fact that Ross waited until after the deadline for dispositive motions to seek more time to locate Williams reflects a lack of

diligence.  Ross could have sought the Court's assistance at any time before this point, and he

provides no justification for his delay communicating with the Court and Defendants about his

difficulty locating Williams and his need for more discovery.

Fourth, Ross named the City of Oakland in his initial Complaint and raised *Monell*-based

claims against the City by his second amended Complaint (*see* Second Am. Compl., Dkt. Nos. 18-

19), but nonetheless has apparently failed to conduct any discovery about the City's practices and

procedures to be able to support his claims against it.

Given the foregoing, the Court finds no indication that Ross diligently pursued discovery

in the past.  *See Hauser v. Farrell*, 14 F.3d 1338, 1340-41 (9th Cir. 1994) (denial of Rule 56(f)

motion proper in light of failure to depose witness within 27 months of filing suit) *overruled on

other grounds by Cent. Bank v. First Interstate Bank*, 511 U.S. 164, 173 (1994); *Mackey*, 867 F.2d

at 524 (a Rule 56(d) movant "cannot complain if it fails diligently to pursue discovery before

summary judgment."); *Freeman*, 827 F. Supp. 2d at 1078 ("where plaintiffs failed to exercise due

diligence, filed an untimely request, or failed to explain why discovery was not conducted, Rule

56(d) discovery requests may be denied."); *see also Cornwell v. Electra Cent. Credit Union*, 439

F.3d 1018, 1027 (9th Cir. 2006) ("The use of orders establishing a firm discovery cutoff date is

commonplace, and has impacts generally helpful to the orderly progress of litigation, so that the

enforcement of such an order should come as a surprise to no one.").

Finally, Ross has not demonstrated that other reasons prevented him from procuring the

discovery he needed.  For instance, there is no indication that Defendants stonewalled him in

discovery by, for example, refusing to produce deponents, documents, and other evidence

necessary to support his claims.  *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 921 (9th

Cir. 1996) (recognizing that outstanding discovery requests may be cause for deferring summary

judgment until discovery is complete).  Additionally, if a party files a summary judgment motion

early in the litigation "before [the other] party has had any realistic opportunity to pursue

discovery relating to its theory of the case, district courts should grant any Rule 56[d] motion

fairly freely."  *Burlington*, 323 F.3d at 773 (citation omitted).  But here Defendants did not file

their summary judgment motion early in the litigation, but rather in full accordance with the

Court's Case Management Schedule.  As noted, Ross did not seek an extension of time to conduct further discovery before now, and there is no suggestion that Ross has not had a realistic opportunity to pursue needed discovery.  Lastly, Ross is represented by counsel, rather than proceeding pro se.  *See Jones v. Blanas*, 393 F.3d 918, 930 (9th Cir. 2004) ("[S]ummary judgment is disfavored where relevant evidence remains to be discovered, particularly in cases involving confined pro se plaintiffs." (citation omitted)).

Without more, the Court cannot find that Ross diligently pursued discovery or has otherwise shown sufficient cause for extending discovery at this time.  Accordingly, the Court denies Ross's Rule 56(d) request for further discovery.

**B.      Admissibility of Williams's Declaration**

Ross's sole proffered evidence as to Lovell is Williams's Declaration, recanting his identification of Ross as the shooter.  Defendants argue that it should not be considered on summary judgment as the document itself is inadmissible evidence and there is no indication that Williams will testify to the contents of his Declaration at trial.  Williams's Declaration is approximately two pages long and states in pertinent part:

> After the shooting, I identified Ronald W. Ross as the shooter.  I gave a statement saying that he was the shooter, and I also testified in court saying that he was the shooter.  But that was not correct. Ronald W. Ross was not the shooter.  I feel confident about this. [¶5]
>
> I always thought that the shooter was Steven Embrey Jr.'s father. [¶6]
>
> I identified Ronald W. Ross as the shooter because the investigating officer, Sgt. Steve Lovell asked me to, and I owed him a favor. . . . When he first showed the [photo line-up of six different pictures] to me, I did not identify any of the men in the photographs as the shooter.  Then, Sgt. Lovell silently indicated to me that I should pick photograph number four.  So, I picked the photograph that Sgt. Lovell indicated I should pick.  When Sgt. Lovell recorded my statement, he did not record the part of the conversation when I did not identify anyone in the lineup.  He tape recorded the part of our conversation that occurred after he had indicated to me which photograph I should pick (number four).  [¶7]
>
> I later testified that the man in photograph number four was the shooter, but that was not true.  [¶8]
>
> Even though I testified against Ronald W. Ross at trial, the reason I

am now saying that he was not the shooter is that he wasn't—he is innocent—and I have spent the last several years living with the regret of having testified against an innocent man.  [¶12].

Williams Decl.

There are three key problems with this evidence: (1) the declaration itself is hearsay; (2) there is no indication that Williams will be available to testify at trial; and (3) the statements are vague and lack foundation.  Defendants also assert that Williams has subsequently renounced his statements above, stating in a more recent interview with persons from the Alameda County's District Attorney's Office that he still believed Ross to be the shooter.  Pereda Decl., Ex. U, Dkt. No. 101.  Ross admits that he has been unable to locate Williams and states that for the purposes of Defendants' summary judgment motion, "Williams appears to be unavailable."  Goff Decl. ¶¶ 2-5; 9; Ross Decl. ¶¶ 2-5, 9.

Under Rule 56, at the summary judgment stage, parties must set out facts they will be able to prove at trial.  "At the summary judgment stage, [courts] do not focus on the admissibility of the evidence's form. . . . [but] instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citation omitted).  Thus, "[w]hile the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citations omitted). Accordingly, "[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001); *Celotex*, 477 U.S. at 324 (a party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *see also* Fed. R. Civ. P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.").

Having carefully reviewed Williams's Declaration, the Court cannot find that it would be admissible at trial.  First, and most importantly, the portions of the Declaration on which Ross relies—namely, that Lovell "silently indicated" to Williams to identify Ross as the shooter and

13

1    that Williams did not at first identify any of the persons in the photo line-up—lack foundation.

2    There is no description about how Williams knew Lovell allegedly wanted him to identify Ross's

3    photo other than the statement that Lovell "silently indicated" this to Williams.  From the

4    description in Williams's Declaration, there is no evidence that Lovell made any actual verbal

5    communication or gesture or other motion, and for all the Court can deduce from this Declaration,

6    Williams might be saying that Lovell telepathically sent him this message.  Without any

7    foundation about how Williams understood this purported silent indication to mean what he took it

8    to mean, the Court cannot appropriately put such evidence before a jury.  The same is true for

9    Williams's statement hat he identified Ross because he owed Lovell a favor—there is no

10   foundation for Williams's and Lovell's pre-existing relationship or why Williams believed he

11   owed Lovell a favor.

12         The other key portion of the Declaration on which Ross relies is Williams's statement that

13   he did not identify anyone in the photo line-up at first and that Lovell did not record the part of the

14   conversation where Williams did not identify anyone.  As Defendants point out, although

15   Williams refers to the fact that he never identified anyone in the photo line-up in various portions

16   of his Declaration, he never explicitly states that he told Lovell that he did not recognize or

17   identify any of the people in the photo line-up.  While Williams refers to a part of the

18   "conversation" that was not recorded, without any foundation about what Williams explicitly told

19   Lovell in that part of the conversation, the Court would be asking a jury to speculate that Williams

20   actually made some statement to Lovell and that statement was actually capable of being recorded.

21         While the Court is mindful of its role in not making determinations that are properly

22   reserved for the jury, it also plays an important gate-keeping function in not inappropriately

23   considering evidence that lacks foundation.  *See* Fed. R. Civ. P. 56(c)(4) (a declaration used at

24   summary judgment motion must "set out facts that would be admissible in evidence").  The Court

25   ordered supplemental briefing about Ross's attempts to locate Williams to assess whether Ross

26   may be able to produce Williams to testify to the contents of his Declaration, but having reviewed

27   Ross's supplemental declaration and his efforts to find Williams, Ross has not shown that he can

28   locate Williams, nor has he provided any other evidence providing the necessary foundation for

United States District Court
Northern District of California

14

Williams's statements on which Ross relies.  While Ross's counsel asserts that he "will" retain a private investigator to locate Williams (*see* Goff Decl. ¶ 12), this assertion is insufficient at this stage in the case.  Since at least the inception of this lawsuit, Ross has known the importance of Williams's testimony, but more than a year and a half have passed since he filed this suit and there is little evidence that he has made any meaningful effort to verify or explore the statements in Williams's Declaration during that time.  As there is no foundation for any of Williams's statements identified above, and Defendants have never had the opportunity to cross-examine Williams, such evidence is not properly admissible at trial.  Accordingly, without any showing that Ross will be able to provide such a foundation at trial, the Court will not consider these statements at summary judgment.

Finally, as Defendants point out, Williams's Declaration as a whole is hearsay.  *See* Fed. R. Evid. 801(c).  And while Ross argues that Williams's Declaration falls into an exception to the hearsay rule under Federal Rule of Evidence 804(b)(3) as a statement against interest, the Court does not find that exception well-supported in these circumstances.  Rule 804(b)(3) provides an exception to the hearsay rule if (1) the declarant is unavailable, and (2) "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability[.]"  Fed. R. Evid. 804(b)(3)(A).

Assuming that Williams is unavailable, Ross argues that Williams's Declaration meets this test because by admitting that he lied at Ross's criminal trial, Williams also admitted that he committed perjury.  Opp'n 7-8.  There are two problems with this argument.  First, to the extent Ross is trying to admit Williams's Declaration in its entirety because some statements in the Declaration may be against Williams's interest, the Supreme Court has held that "the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory."  *Williamson v. United States*, 512 U.S. 594, 600-01 (1994).  Accordingly, only the self-inculpatory statements of Williams's Declaration are arguably admissible, while the rest of his statements are still hearsay.

But second, the Court does not find that the circumstances of this case support the admission of Williams's arguably self-inculpatory statements where they inculpate Lovell. The text of Rule 804(b)(3) is significant in this respect, because the context of Williams's statements diminishes the notion that a reasonable person in Williams's position would have only made these statements if he believed them to be true. Williams's Declaration does not acknowledge that he is aware of the potential criminal consequences for recanting his former trial testimony, nor is there any indication that his statements were in fact "so contrary" to his interests that he would not have made the statements unless they were true. Rather, the opposite could be the case here. William's statements do not merely inculpate him for potential perjury, but actually shift the blame to Lovell, indicating that Lovell induced Williams to lie. The Court cannot say that a reasonable person in Williams's position would have only made these statements inculpating Lovell if the statements were true—Williams might well have thought that he was saving himself from blame rather than putting himself at any risk of criminal liability. In a sense, accusing Lovell of misconduct appears to excuse Williams's false testimony. The record is not adequately developed to conclusively determine Williams's motivation in making these statements, but without more, the Court cannot find that his statements are "so contrary" to his interests such that Rule 804(b)(3) is applicable.

Ross has provided no other viable arguments for why Williams's Declaration is admissible on its own. While he makes arguments about the state of mind exception and the statement by a party opponent exception, these arguments do not support the admissibility of Williams's Declaration but rather deal only with the hearsay statements within the hearsay document itself. In other words, before Ross can support the internal hearsay statements, he must show that the Declaration itself is capable of admission. He has not done so.

In light of the foregoing, the Court cannot find this document to be competent summary judgment evidence. Accordingly, the Court will not consider Williams's Declaration in its analysis.

### DISCUSSION

In his Opposition, Ross states that "[t]here are two causes of action that the Plaintiff has brought in this case against the Defendant Steve Lovell and against the City of Oakland under

1    *Monell* for failure to adequately train.  The two causes of action are Malicious Prosecution and

2    Brady Rule Violation."  Opp'n at 5.  The Court first considers Ross's claims against Lovell and

3    then his claims against the City.

4    **A.      Claims Against Lovell**

5            Ross brings claims against Lovell under § 1983 for malicious prosecution and a *Brady*

6    violation.  Section 1983 provides a remedy for constitutional violations by persons acting under

7    the color of state law.  It provides, in relevant part:

8                Every person who, under color of any statute, ordinance, regulation,
             custom, or usage, of any State . . . . subjects, or causes to be
9             subjected, any citizen of the United States . . . . to the deprivation of
             any rights, privileges, or immunities secured by the Constitution and
10            laws, shall be liable to the party injured in an action at law, suit in
             equity, or other proper proceeding for redress.
11

12   42 U.S.C. § 1983.  "Section 1983 is not itself a source of substantive rights, but merely provides a

13   method for vindicating federal rights elsewhere conferred."  *Albright v. Oliver*, 510 U.S. 266, 271

14   (1994) (quotation and internal marks omitted).  To prevail on a § 1983 claim, a plaintiff must

15   show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution; (2)

16   by a person acting under the color of state law.  42 U.S.C. § 1983.

17           Malicious prosecution actions are not limited to suits against prosecutors and may be

18   pursued against other persons who have wrongfully caused charges to be filed.  *Awabdy v. City of*

19   *Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004); *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119,

20   1126-27 (9th Cir. 2002).  Likewise, in the Ninth Circuit, individual police officers may be held

21   liable for their *Brady* violations under § 1983 if the officers act "with deliberate indifference to or

22   reckless disregard for an accused's rights or for the truth in withholding evidence from

23   prosecutors."  *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1088 (9th Cir. 2009);

24   *Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011) ("*Brady* requires both prosecutors and police

25   investigators to disclose exculpatory evidence to criminal defendants.").  The Court first considers

26   Ross's malicious prosecution claim, and second, his *Brady* violation claim.

27           1.      Malicious Prosecution

28           To prevail on his malicious prosecution claim, Ross must show that Lovell prosecuted him

United States District Court
Northern District of California

17

1    with malice and without probable cause and that he did so for the purpose of denying Ross a

2    specific constitutional right.  *Lacey v. Maricopa Cty.*, 693 F.3d 896, 919 (9th Cir. 2012).

3         Among other things, Lovell argues Ross cannot prove probable cause because Alameda

4    County District Attorneys independently evaluated the case against Ross before initiating criminal

5    charges.  Mot. at 22.  "A prosecutor's independent judgment may break the chain of causation

6    between the unconstitutional actions of other officials and the harm suffered by a constitutional

7    tort plaintiff."  *Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008); *see also McSherry v.*

8    *City of Long Beach*, 584 F.3d 1129, 1137 (9th Cir. 2009).  "Put in traditional tort terms, the

9    prosecutor's independent decision can be a superseding or intervening cause of a constitutional

10   tort plaintiff's injury, precluding suit against the officials who made an arrest or procured a

11   prosecution."  *Id.* (quoting *Beck*, 527 F.3d at 862).

12        In support of their Motion, Defendants submitted the Declaration of Alameda County

13   Deputy District Attorney Ken Kingsbury, who handled the preliminary hearing in Ross's criminal

14   trial.  Kingsbury Decl., Dkt. No. 75.  Kingsbury states that "[i]n maintaining [Ross's criminal

15   case] and preparing for the preliminary hearing, I independently reviewed the evidence and

16   investigation in this matter."  *Id.* ¶ 6.  He explains that these efforts included "interviewing

17   Renardo Williams before the preliminary hearing; reviewing the photo line-ups to ensure that they

18   were not misleading or suggestive; reviewing the crime report and witness statements; reviewing

19   the physical evidence; and ensuring that there was sufficient cause to maintain the action."  *Id.*  He

20   states that he has "no knowledge that Steven Lovell withheld or fabricated any evidence in this

21   matter."  *Id.* ¶ 7.

22        Defendants also provided the Declaration of Alameda County Deputy District Attorney

23   Kevin Wong, in which Wong likewise states that he independently reviewed the evidence and

24   investigated the case against Ross.  Wong Decl. ¶ 9, Dkt. No. 79.  His investigation and review

25   included interviewing witnesses, including Williams, Travis Abner, and Steven Embrey before

26   trial.  *Id.*  It also included reviewing all available crime reports, witness statements, and physical

27   evidence.  *Id.*  According to Wong, Lovell never pressured him or, to his knowledge, anyone else

28   in the District Attorney's Office to prosecute Ross.  *Id.* ¶ 11.  He states that he has no knowledge

1    that Lovell withheld or fabricated any evidence.  *Id.* ¶ 10.

2         Ross provides no evidence contradicting the prosecutors' attestations that they

3    independently investigated the evidence against Ross.  In fact, Ross agreed that it was undisputed

4    that "Prosecutors independently determined that there was sufficient case to maintain the action

5    against Ross" and that "Lovell never pressured the prosecutors in any way to prosecute Ross."

6    *See* Pl.'s Stmnt. of Material Facts at 2; CUF ##48-49.  Furthermore, the evidence presented

7    indicates that Lovell disclosed potentially contradictory evidence to prosecutors, including writing

8    in his police report that Williams had told him the shooter was bald, despite Ross's picture from

9    the line-up showing him with hair.  Lovell Decl. ¶¶ 20-21.  This indicates that Lovell did not

10   manipulate the evidence before the prosecutors but actually exposed a basis for which the

11   prosecutors might have questioned Williams's identification of Ross as the shooter.  Ross has

12   provided no specific facts showing that Lovell's actions prevented the prosecutors from exercising

13   their independent judgment in deciding whether to charge and prosecute Ross.  Finally, to support

14   this claim, Ross relies exclusively on Williams's Declaration, and without this document, Ross has

15   no evidence to show a genuine dispute of material fact on this claim for trial.  Given Defendants'

16   evidence that the prosecutors exercised independent judgment and that Ross does not have

17   evidence to dispute the Defendants' proof, the Court finds that this breaks the chain of causation

18   between Lovell's alleged malicious prosecution and the harm suffered by Ross.  *See McSherry*,

19   584 F.3d at 1137.  Without facts showing that Ross can meet the elements of his malicious

20   prosecution claim, Ross cannot maintain this cause of action against Lovell.

21        2.    *Brady* Violation Claim

22        In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of

23   evidence favorable to an accused upon request violates due process where the evidence is material

24   either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373

25   U.S. 83, 87 (1963).  Accordingly, *Brady* requires both prosecutors and police investigators to

26   disclose exculpatory evidence to criminal defendants.  *Almada*, 640 F.3d at 939 (citing *Tennison*,

27   570 F.3d at 1087 (allowing § 1983 claim against police inspector for *Brady* violation)).

28        A *Brady* claim has three elements:  "First, there must be evidence that is favorable to the

United States District Court
Northern District of California

1   defense, either because it is exculpatory or impeaching. Second, the government must have

2   willfully or inadvertently failed to produce the evidence. Third, the suppression must have

3   prejudiced the defendant." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013) (citing *Strickler v.*

4   *Greene*, 527 U.S. 263, 281-82 (1999)).   "Any evidence that would tend to call the government's

5   case into doubt is favorable for *Brady* purposes." *Id.* at 1013.  It includes both "exculpatory and

6   impeachment material that is relevant either to guilt or punishment." *Id.* at 1012 (citation

7   omitted).

8        Ross's only evidence to support his *Brady* claim is Williams's Declaration. *See* Opp'n at

9   15.  However, as the Court has found Williams's Declaration inadmissible, and there is no

10  indication that Williams will be available to testify to the contents of his Declaration at trial, Ross

11  has no evidence to support his *Brady* claim.  Thus, he cannot show that conflicting facts create a

12  genuine dispute for trial about whether Lovell failed to produce exculpatory or impeaching

13  evidence.  Nor can Ross show that Lovell's actions prejudiced Ross at his criminal trial.

14  Accordingly, Ross cannot maintain his *Brady* claim against Lovell.

15  **B.**      **Claims Against the City**

16       To impose liability against a municipal entity for a constitutional violation under § 1983, a

17  plaintiff must show that an official's action that caused the plaintiff's injury was pursuant "to

18  official municipal policy of some nature." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690

19  (1978).

20       First, Ross has not shown that an official's action caused him injury.  As noted above, his

21  claims against Lovell for malicious prosecution and a *Brady* violation fail for lack of support.

22  Second, Ross has not demonstrated that his alleged constitutional deprivation was the product of

23  the City's policy or custom.  His only evidence that such a policy or custom exists is a Wikipedia

24  article concerning a prior case, *Allen. et al. v. City of Oakland, et. al.*, No. 00-4599-TEH (N.D.

25  Cal.), where the City settled with plaintiffs through a consent decree in 2003 over allegations that

26  four officers allegedly kidnapped, planted evidence, and beat citizens, while the Oakland Police

27  Department either allegedly encouraged or turned a blind eye to this misconduct. *See* Opp'n at

28  16-17; Goff Decl., Ex. B (Wikipedia article), Dkt. No. 104-5.  Even assuming this document is

United States District Court
Northern District of California

20

competent evidence for the Court's review, it does not show the existence of a municipal policy or practice to maliciously prosecute or to withhold exculpatory evidence.  While Ross argues that the consent decree[3] shows a "long-standing and pervasive pattern of Oakland Police Department officers misusing their authority by falsely arresting people and fabricating evidence," neither false arrest nor fabrication of evidence is a claim in this case.  *See* Opp'n at 5 (stating that the only two causes of action are "Malicious Prosecution" and "Brady Rule Violation" and specifically renouncing any false evidence claim).  Ross's claim against the City thus fails on both prongs of the *Monell* test.  *See, e.g.*, *McSherry*, 584 F.3d at 1147 ("Because McSherry has no case against the officers, and because he tenders no facts . . . of a policy statement, ordinance, regulation, decision, custom, usage, or practice of either the City of Long Beach or the Long Beach Police Department that caused his injury, . . . his Monell claim also fails as a matter of law." (citations omitted)).  Accordingly, the City's Motion for Summary Judgment on Ross's *Monell* claim is **GRANTED**.

**CONCLUSION**

Based on the analysis above, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment.  Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: July 14, 2015

_____
MARIA-ELENA JAMES
United States Magistrate Judge

---

[3] Plaintiff did not provide a copy of that consent decree or any other documents filed in the *Allen* case.

United States District Court
Northern District of California